IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ADRIAN T. HORRELL, | : | |
|     Plaintiff | : | No. 1:20-cv-01454 |
| | : | |
| v. | : | (Judge Kane) |
| | : | |
| ABB ENTERPRISE SOFTWARE, | : | |
| Successor to ABB TROPOS WIRELESS | : | |
| RESEARCH CENTER, | : | |
| A DIVISION OF ABB, INC., | : | |
|     Defendant | : | |

**MEMORANDUM**

Before the Court is Defendant ABB Enterprise Software, Successor to ABB Tropos Wireless Research Center, a Division of Defendant ABB, Inc. ("Defendants")[1] Motion to Dismiss (Doc. No. 19) Plaintiff Adrian T. Horrell ("Plaintiff")'s Second Amended Complaint ("SAC") (Doc. No. 18). For the reasons provided herein, the Court will grant Defendants' motion to dismiss.

**I.  BACKGROUND**[2]

Plaintiff is an adult individual who resides at 7080 Creek Crossing Road, Harrisburg, Dauphin County, Pennsylvania. (Doc. No. 18 ¶ 1.) Plaintiff alleges that Defendant ABB Inc. is a "Delaware corporation with offices at 3055 Orchard Drive, San Jose, California (hereinafter 'the company')" that has at all relevant times regularly conducted business in Pennsylvania and employs Plaintiff at his home office in Harrisburg. (Id. ¶¶ 2-3.)

---

[1] Defendants maintain that the proper Defendants in this matter are ABB Enterprise Software Inc. and ABB Inc., and that Plaintiff incorrectly named the Defendants in this matter as ABB Enterprise Software, Successor to ABB Tropos Wireless Research Center, a Division of ABB Inc. (Doc. No. 19 at 1.)

[2] The following factual allegations, accepted as true for purposes of the instant motion to dismiss, are taken from Plaintiff's SAC. (Doc. No. 18.)

Plaintiff asserts that on or about December 4, 2012, he accepted a written offer of employment with the company for the position of Sales Director – Great Lakes/North East Region.  (Id. ¶ 4.)  Plaintiff alleges that "[t]he offer provided that the Plaintiff would be compensated with a base salary and an incentive compensation plan that provided for commissions based on sales."  (Id.)  Plaintiff asserts that he remains employed by the company as the sales director for the North East Region of the USA and Canada, with a sales territory including "Ohio, Pennsylvania, New York, New Jersey, Rhode Island, Connecticut, Massachusetts, Vermont, New Hampshire, Maine, Eastern Canada and other specific accounts in the USA."  (Id. ¶ 5.)

Plaintiff's SAC attaches as Exhibit A a copy of the company's 2018 calendar year Sales Incentive Compensation Plan ("SICP") which he alleges "provided for a commission on sales generated at a rate of five percent (5%) for sales exceeding one hundred percent (100%) of the individual's quota."  (Id. ¶ 6; Doc. No. 18-1.)  Plaintiff asserts that "[f]rom the commencement of his employment, Plaintiff has exceeded his sales quotas in five (5) of his eight full years and has le[]d the company in sales bookings in six (6) of his eight (8) full years for the business unit globally," and that "[a]t no time from 2012 to 2018 was there any limit on commissions or limitations on large orders that could be earned by the company's sales force and specifically by the Plaintiff."  (Id. ¶¶ 7-8.)

Plaintiff alleges that "[f]rom the commencement of his employment, [he] began cultivating a relationship with the executives of FirstEnergy in an effort to make a substantial sale on behalf of the company," and that "[a]t the end of 2018, Plaintiff was near closing three orders over a three-year period with FirstEnergy, totaling in excess of sixteen million three hundred thousand dollars ($16,300,000.00)."  (Id. ¶ 9.)  Plaintiff further alleges that "[a]t the

direction of his superiors, [he] consolidated the FirstEnergy deal from three (3) purchase orders that would have been completed over three (3) years into one (1) sale, so that the sales numbers would be more beneficial for Plaintiff's superiors in terms of sales numbers and profit margin." (Id. ¶ 10.) Plaintiff asserts that "[u]pon information and belief," "his superiors' compensation was based, at least in part, on sales numbers and profit margin." (Id. ¶ 11.) Plaintiff alleges that the "FirstEnergy deal was one of the largest ever by the company in the United States and the second largest ever for the Plaintiff's sales region," and that Plaintiff "previously consummated a sale to DTE, which sale was the largest ever in the history of ABB Wireless globally." (Id. ¶¶ 12-13.) Plaintiff asserts that "[t]he management team applied the terms of the 2018 SICP to determine the Plaintiff's commission for the DTE sale," and that he "was the responsible sales representative for two (2) of the three (3) largest sales in the history of the company, worldwide." (Id. ¶¶ 14-15.)

Plaintiff alleges that "[i]n April of 2019, the company announced its unilateral change of the SICP for its sales force, reducing the top compensation rate from five percent (5%) to one and one quarter percent (1.25%), creating a special category of 'large orders' (greater than $10,000,000.00), and capping the total commission that could be earned at five hundred thousand dollars ($500,000.00)," and that, at that time, he "was the only employee of the company who had a pending sale of a 'large order' (greater than $10,000,000.00)." (Id. ¶ 20.) Plaintiff attaches a copy of the 2019 SICP as Exhibit B to the SAC. (Id.; Doc. No. 18-2.)

Plaintiff alleges that "[a]t all times relevant hereto, the company employed a management team consisting of Brian Carlson, VP Sales North America, Canada & Mexico PGGA, Mike Carlson, SVP Sales and Marketing PGGA, Darren Caldwell, SVP and General Manager Automation and Communication PGGA, Mike Atkinson, Hub Manager PGGA USA, Jeff

3

Simmons, HR Hub Manager PGGA, and Massimo Danielle, Managing Director Business Unit Grid Automation." (Id. ¶ 16.) Plaintiff asserts that "[f]rom 2019 until 2020, the management team represented to Plaintiff that the company would exercise its discretion to include the combined award of the FirstEnergy deal under the 2018 SICP verbally." (Id. ¶ 17.)

More specifically, Plaintiff alleges that the following verbal representations were made to him with regard to the applicability of the 2018 SICP to the FirstEnergy deal:

a. On April 4, 2019, Plaintiff had a telephone conference call with Daren Cauldwell and Brian Carlson where the unfairness of the 2019 SICP plan was discussed. Darren Cauldwell told Plaintiff that he would look into applying the 2018 plan to the several large opportunities that Plaintiff was working on that could exceed ten million dollars ($10,000,000.00) in 2019 and get back to him.

b. On May 2, 2019, Plaintiff met with Mike Atkinson in Raleigh, North Carolina and discussed how the 2019 SICP was biased against him. Mike Atkinson informed Plaintiff that he would discuss the concern with Darren Cauldwell.

c. On May 23, 2019, Plaintiff had a telephone conversation with Darren Cauldwell wherein Plaintiff asked about the status of the S[IC]P issue. Mr. Cauldwell replied that it had gone no further.

d. On August 21, 2019, during a Skype conference with Brian Carlson, Mr. Carlson informed Plaintiff that the resolution of the commission payable on the FirstEnergy deal would also affect his own compensation but reported that the issue had still not been resolved. At this time, Plaintiff was being pushed to try and consolidate the FirstEnergy deals into one. Plaintiffs was seeking an assurance that he would be paid under the 2018 SICP if he could pull off a combined deal.

e. On October 29, 2019, at Treesdale Golf Club in Cranberry Township, Pennsylvania, Plaintiff attended a meeting with the FirstEnergy management team and Dave Tiller, strategic account manager of ABB. During that meeting the FirstEnergy representatives communicated that the three (3) deals could be consolidated into one (1) deal and purchase order.

f. On November 12, 2019, during a risk review meeting including the management team (including the US and Zurick) held via Skype, Plaintiff confirmed that the FirstEnergy deal would be consolidated into one purchase order for all three (3) years.

g. On November 13, 2019, Plaintiff, while at the Double Tree Hotel in Bristol, Connecticut, had a telephone conference with Darren Cauldwell. Plaintiff requested confirmation that he would be paid under the 2018 SICP. Darren Cauldwell told Plaintiff, "I looked after you for the DTE deal. Didn't I?" The inference, upon which Plaintiff reasonably and justifiably relied, was that if the purchase order or letter of award was received by the end of 2019, Plaintiff would be compensated as he was for the DTE deal in 2018, under the 2018 SICP.

h. On December 18, 2019, at a joint executive dinner with FirstEnergy in Fairlawn, Ohio at the Kenneth Stewart Grill House, Plaintiff had a conversation with Anders Sjoelin, Managing Director of ABB USA. Plaintiff informed him that the commission issue was still not resolved, and he was relying on the good faith of ABB to pay him as promised. Mr. Sjoelin told Plaintiff, "I will make sure you are fairly compensated for the hard work."

i. On January 13, 2020, during a telephone call with Brian Carlson, Plaintiff was informed that the commission issue had not been resolved, but Carlson encouraged Plaintiff to keep pushing management on the matter.

j. On January 28, 2020, Plaintiff met with Mike Carlson at the Hyatt Hotel in San Antonio, Texas to discuss the commission on the FirstEnergy deal. Mr. Carlson told Plaintiff that the matter should have been resolved months ago and that ABB was sloppy for not doing so. Mr. Carlson related that he would work with senior management to reach an amicable resolution.

k. In February 2020, Brian Carlson telephoned Plaintiff to request that he sign the 2019 SICP retroactively at the request of management, which request Plaintiff refused.

l. There were other similar communications discussing the commission for the FirstEnergy deal, especially with Brian Carlson, though Plaintiff cannot recall the specific dates or words communicated, which communications were consistent with the proposition that the management team would exercise its discretion to utilize the 2018 SICP for Plaintiff's commission on the FirstEnergy deal.

(Id.)

Plaintiff further alleges that "[u]pon information and belief, the management team made additional representations about the matter of the Plaintiff's commission for the FirstEnergy sale via email correspondence," but due to the fact that "the company entered into an acquisition with Hitachi on June 1, 2020 . . . all emails from before April 1, 2020, were annexed by ABB, Inc."

5

and so "[t]he Company has exclusive possession of emails dated before April 1, 2020 and Plaintiff does not have access to those emails." (Id. ¶ 18.)

Plaintiff asserts that he "reasonably relied on the representations of the management team that the 2018 SICP would be [applied] to the FirstEnergy sale to his financial detriment." (Id. ¶ 19.) Plaintiff asserts that he "never signed nor agreed to the 2019 SICP, which fact was communicated to the management team verbally and via email on several occasions throughout 2019." (Id. ¶ 21.) Plaintiff further asserts that he "had achieved one hundred percent (100%) of his sales quota of eight million dollars ($8,000,000.00) for 2018 exclusive of the FirstEnergy sale," and alleges that "[t]he letter of award was obtained from FirstEnergy for sale of equipment and services supplied by the company in the amount of sixteen million three hundred thousand dollars ($16,300,000.00) on December 31, 2019." (Id. ¶¶ 22-23.) Plaintiff maintains that "[t]he company has failed and refused to pay [him] his earned commission of eight hundred fifteen thousand dollars ($815,000.00), equaling five percent (5%) owed on the FirstEnergy sale as promised and agreed to by the management team," and that, "[t]o date, the company has paid Plaintiff only sixty-six thousand four hundred eighty-eight dollars and thirty-one cents ($66,488.31) in commission for the First Energy deal." (Id. ¶¶ 24-25.)

On August 17, 2020, Plaintiff filed his initial complaint against Defendants (Doc. No. 1), and subsequently, on September 10, 2020, filed an Amended Complaint (Doc. No. 4) changing the naming of the Defendants.[3] The Amended Complaint asserted claims of breach of contract

---

[3] The only difference between Plaintiff's complaint and Amended Complaint was his designation of the Defendants in this matter. In his complaint Plaintiff describes the defendants in this matter as follows: "ABB Tropos Wireless Research Center, is a division of ABB, Inc., a Swiss-Swedish international corporation." (Doc. No. 1 ¶ 2.) In his Amended Complaint Plaintiff describes the defendants in this matter as follows: "ABB Enterprise Software, a Delaware corporation, successor in interest to ABB Tropos Wireless Research Center, is a division of ABB, Inc., a Delaware corporation." (Doc. No. 4 ¶ 2.)

(Count 1), fraud (Count 2), negligent misrepresentation (Count 3), promissory estoppel (Count 4), and a wage claim under California law (Count 5), arising out of Defendants' failure to pay Plaintiff $748,511.69 in commission payments associated with the FirstEnergy transaction that he alleges was due him pursuant to the 2018 SICP. After Defendants filed a motion to dismiss Plaintiff's Amended Complaint for failure to state a claim upon which relief may be granted (Doc. No. 8), the Court issued a Memorandum and Order on March 23, 2021 (Doc. Nos. 16, 17) dismissing Plaintiff's claims.

The Court's Order dismissed Plaintiff's breach of contract and wage claims with prejudice, but dismissed his fraud, negligent misrepresentation, and promissory estoppel claims without prejudice to his right to file a second amended complaint addressing the pleading deficiencies in those claims identified by the Court in its Memorandum. (Doc. No. 17.) In dismissing Plaintiff's fraud, negligent misrepresentation, and promissory estoppel claims, the Court found that Plaintiff's amended complaint failed to plausibly allege some action that Plaintiff took or refrained from taking in justifiable reliance on the alleged promises/representations to his financial detriment, a failure that was fatal to all three claims, as all three claims require a plausible allegation of "justifiable reliance." (Doc. No. 16 at 20-27.) However, as noted, the Court permitted Plaintiff the opportunity to file a second amended complaint to afford him a final opportunity to allege facts demonstrating that he took or refrained from taking some action in justifiable reliance on representations made by Defendant, to his financial detriment. (Id.)

On April 9, 2021, Plaintiff filed the SAC reasserting his claims of fraud, negligent misrepresentation, and promissory estoppel. (Doc. No. 18.) On April 28, 2021, Defendants filed a motion to dismiss Plaintiff's SAC (Doc. No. 19), accompanied by a brief in support (Doc.

7

No. 20). On May 7, 2021, Plaintiff filed a brief in opposition to Defendants' motion (Doc. No. 21), and Defendants filed a reply brief on May 18, 2021 (Doc. No. 22). Accordingly, the motion has been fully briefed and is ripe for disposition.

## II. LEGAL STANDARD

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests. See Phillips v. Cty. of Allegheny, 515 F.3d 224, 232 (3d. Cir. 2008). The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief. See Fed. R. Civ. P. 8(a). Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for its "failure to state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir 2010). The Court's inquiry is guided by the standards of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). Under Twombly and Iqbal, pleading requirements have shifted to a "more heightened form of pleading." See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir 2009). To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible. See id. The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct. As the Supreme Court instructed in Iqbal, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of

8

misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  See Iqbal, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under Twombly and Iqbal, the United States Court of Appeals for the Third Circuit has identified the following steps a district court must take when determining the sufficiency of a complaint under Rule 12(b)(6):  (1) identify the elements a plaintiff must plead to state a claim;  (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth;  and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief."  See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (citation and quotation marks omitted).

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).  A court may also consider "any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'"  See Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004)).

## III. DISCUSSION

Defendants argue that Plaintiff's SAC again fails to plausibly allege claims for promissory estoppel, negligent misrepresentation, and fraud. The Court addresses each claim in turn.[4]

### A. Promissory Estoppel Claim

In Pennsylvania, a claim for promissory estoppel requires an allegation that: "(1) the promisor made a promise that [it] should have reasonably expected would induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise." See Zandier v. Babcock & Wilcox Construction Co. Inc., et al., No. 2:13-cv-459-JFC, 2015 WL 757480, at *20 (W.D. Pa. Feb. 23, 2015) (quoting V-Tech Servs., Inc. v. Street, 72 A.3d 270, 276 (Pa. Super. 2013) (internal quotation omitted)). The elements of promissory estoppel are "strictly enforced to guard against the 'loose application' of promissory estoppel." See Peluso v. Kistner, 970 A.2d 530, 533 (Pa. Commw. 2009) (internal citation omitted)). "The change in the plaintiff's position must be substantial, and there is 'no injustice in being deprived of a gratuitous benefit.'" See id. (quoting Stelmack v. Glen Alden Coal Co., 196 A.2d 127, 130 (Pa. 1940)).

As noted above, in granting Defendants' motion to dismiss the promissory estoppel claim asserted by Plaintiff in his amended complaint, the Court found that Plaintiff had failed to

---

[4] The Court notes that, although the parties previously disputed which state's law—Pennsylvania or California—governed Plaintiff's various claims in connection with Defendants' motion to dismiss Plaintiff's amended complaint, the briefing on the instant motion reflects that both Plaintiff and Defendants apply the law of the forum state, Pennsylvania, to the claims asserted. Because the Court has jurisdiction based on diversity of citizenship and amount in controversy pursuant to 28 U.S.C. § 1332, and in light of the parties' apparent agreement to that effect, the Court applies substantive Pennsylvania law.

plausibly allege an action that he took or refrained from taking in reliance on Defendants' alleged promise to apply the 2018 SICP to the FirstEnergy transaction, to his financial detriment. (Doc. No. 16 at 23.) In so finding, the Court noted that Plaintiff's Amended Complaint did not allege that he would have closed one (or all three) of the FirstEnergy purchases earlier (in 2018) had he known that the terms of the 2018 SICP would not ultimately be applied to the completed FirstEnergy transaction. (Id. at 23.) In addition, the Court noted that, to the extent Plaintiff's detrimental reliance allegation was based on the fact that he continued working on the FirstEnergy deal for the company, he did not allege "that he had some other, more profitable, employment opportunity or course of action that he would have pursued had he known that the terms of the 2018 SICP would not ultimately be applied to any part of the FirstEnergy transaction." (Id.)

The allegations of Plaintiff's SAC pertaining to his promissory estoppel claim incorporate the representations described above and also include the following: "[a]t all times relevant hereto, the management team misrepresented to the Plaintiff, verbally and in emails, that the 2018 SICP would apply to his commission on the FirstEnergy sale, as more specifically set forth above" (Doc. No. 18 ¶ 42); "[h]ad plaintiff not relied on the misrepresentations of the management team, the three (3) deals would have been achieved over three (3) years rather than in one (1) year" (id. ¶ 43); "[h]ad plaintiff not relied on the misrepresentations of the management team, none of the three (3) deals would have been deemed 'large orders' greater than ten million dollars ($10,000,000.00)" (id. ¶ 44); "[r]elying on the management team's misrepresentation, Plaintiff continued working on the deal for the company and, at the direction of the management team, combined the three (3) separate purchases of the FirstEnergy sale into a single deal, totaling in excess of sixteen million three hundred thousand dollars

11

($16,300,00[0].00), which deal was signed in December of 2019" (id. ¶ 45); "Plaintiff combined the three (3) separate purchases into one (1) deal to his financial detriment, reasonably and justifiably relying on the management team's course of misrepresentations that the 2018 SICP would apply to the FirstEnergy commission" (id. ¶ 46); "[h]ad Plaintiff not relied upon the representations of the management team: a. Plaintiff's commission for the deals would not be capped at $500,000 per the changes to the SICP implemented for large orders (greater than $10,000,000.00) in 2019; and b. Plaintiff's commission rate would have been 5% rather than 1.25% per the changes to the S[IC]P implemented for large orders (greater than $10,000,000.00) in 2019" (id. ¶ 47); and "[i]njustice can only be avoided by enforcing the promises/course of misrepresentation of the management team to apply the 2018 SICP to the FirstEnergy sale" (id. ¶ 48).

Defendants proffer several arguments in support of their motion to dismiss Plaintiff's promissory estoppel claim. First, Defendants maintain that, while Plaintiff's SAC alleges that "[f]rom 2019 until 2020, the management team represented to Plaintiff that the company would exercise its discretion to include the combined award of the FirstEnergy deal under the 2018 SICP verbally," such an allegation—pertaining to representations made in 2019 and 2020—cannot plausibly support a claim that Plaintiff acted "at the end of 2018" in detrimental reliance on such representations. (Doc. No. 20 at 15-16.) As noted above, Plaintiff's SAC alleges that "[a]t the end of 2018 [he] was near closing three orders over a three-year period with FirstEnergy" and also that "[h]ad plaintiff not relied on the misrepresentations of the management team, the three (3) deals would have been achieved over three (3) years rather than in one (1) year." (Doc. No. 18 ¶¶ 9, 43.)

12

Second, Defendants maintain that the representations allegedly relied on by Plaintiff are "too vague and indefinite to be enforced" by way of a promissory estoppel claim. (Doc. No. 20 at 16.) Defendants point to the following allegations of the SAC (concerning representations made from April 2019 through January 2020) in support of their argument:

- a member of the management team stated that he "would look into applying the 2018 plan to the several large opportunities that Plaintiff was working on";

- a member of the management team stated that he "would discuss the concern" of the application of the 2019 SICP with another member of management;

- a member of the management team told Plaintiff that the "status of the SICP issue . . . had gone no further";

- a member of the management team told Plaintiff that "the [SICP] issue had still not been resolved";

- in response to Plaintiff's request for confirmation that "he would be paid under the 2018 SICP," a member of the management team stated that he "looked after [Plaintiff] for the DTE deal[,] [d]idn't I?";

- in response to Plaintiff's statement to a member of the management team that the "commission issue was still not resolved," he was informed that he would be "fairly compensated for the hard work";

- a member of the management team told Plaintiff that the "commission issue had not been resolved"; and

- a member of the management team told Plaintiff that "the matter should have been resolved months ago," and that management would work to "reach an amicable resolution."

(Doc. No. 18 ¶ 17.) Defendants maintain that, even if true, the above representations fail to constitute a definite enforceable promise, a necessary element of a claim for promissory estoppel. Defendants argue that the above allegations do not reflect a "commitment by any member of Defendants' management team to calculate commissions on the FirstEnergy deal in any particular way, to pay Plaintiff any particular amount of commission on the FirstEnergy deal,

13

or to apply the 2018 SICP to a transaction that closed in December of 2019." (Doc. No. 20 at 19.)

Third, Defendants maintain that, even assuming that the timing of the alleged representations could support a claim of detrimental reliance, and further assuming that the above representations are sufficiently definite to constitute an enforceable promise, Plaintiff's promissory estoppel claim still fails because any reliance on such representations was not justifiable or reasonable. (Id. at 20.) In this regard, Defendants rely on authority providing that "[a] claim for [promissory] estoppel cannot survive when the plaintiff's actions were based on 'his own will and judgment' rather than the defendant's representations." (Id.) (quoting Luther v. Kia Motors Am., Inc., 676 F. Supp. 2d 408, 422 (W.D. Pa. 2009) (internal quotation omitted)). Defendants maintain that, because the 2018 and 2019 SICPs "set forth the conditions that must be met in order for commission to be calculated and paid pursuant to their respective terms," including the applicable dates of each SICP, and Defendants' reservation of discretion to modify and make adjustments to any award of incentive compensation, Plaintiff's reliance on any representations contrary to the terms of the 2018 and 2019 SICP cannot have been reasonable. (Doc. No. 20 at 20-21.)[5] Defendants maintain that Plaintiff's reliance on any statements made

---

[5] In its Memorandum on Defendants' initial motion to dismiss, the Court, in discussing Plaintiff's original breach of contract claim, stated that:

> [T]he 2018 SICP contains several provisions expressly reserving to Defendants the discretion to modify the terms governing an employee's right to incentive compensation under the SICP. First, the 2018 SICP contains an explicit reservation of Defendants' "right to announce exclusions, modifications and exceptions to [the SICP and Sales Incentive Compensation Policy] at any time with no prior notice." (Doc. No. 4-2 at 1.) The 2018 SICP further states that "[t]his Plan is subject to amendment, modification, or termination at the discretion of [Defendants] at any time with no prior notice." (Id. at 4.) Significantly, the 2019 SICP twice states that "[Defendants] further reserve[] the right to make adjustment in the amount and distribution of incentive compensation in the event of circumstances unforeseen or to insure a fair and equitable final arrangement." (Id. at 1, 2.)

14

by members of the management team was "the result of Plaintiff's own 'mistaken judgment'" and therefore cannot constitute justifiable or reasonable reliance sufficient to support a promissory estoppel claim. (Id. at 22.)

In response, Plaintiff first maintains that the alleged verbal statements of various members of Defendants' management team are "certain and explicit enough" to support a conclusion that Defendants' intention was to apply the 5% commission rate of the 2018 SICP to the FirstEnergy sale. (Doc. No. 21 at 8-9.) In addition, Plaintiff maintains that he reasonably relied on the representations of Defendants' management team in light of the 2019 SICP's language that management retained discretion "to ensure a fair and equitable final arrangement." (Id. at 9) (quoting Doc. No. 18-2 at 1). Plaintiff maintains that the "reasonable inference from this language, coupled with Mr. Cauldwell's reference to the DTE deal, is that management promised to apply the 2018 plan to the FirstEnergy Sale or to ignore the changes for large orders implemented with the 2019 plan for that sale." (Id.) As to the action taken by him in reliance on the representations of Defendants' management, Plaintiff states that he "consolidated what would have been three (3) separate orders, none of which would have been 'large orders' as defined by the 2019 SICP, into a single purchase order," and that injustice can only be avoided by application of the five (5) percent commission rate to the combined FirstEnergy sale. (Id. at 10-11.)

Upon careful consideration of the allegations of the SAC and the relevant authorities, the Court finds that Plaintiff has failed to plausibly allege a claim of promissory estoppel. The Court agrees with Defendants that the representations outlined by Plaintiff in the SAC are not definitive

---

(Doc. No. 16 at 15.)

enough to constitute an enforceable promise to treat Plaintiff's incentive compensation related to the FirstEnergy sale in a particular way. A promissory estoppel claim "requires an express promise between the promisor and promisee." See Burton Imaging Grp. v. Toys "R" Us, Inc., 502 F. Supp. 2d 434, 439 (E.D. Pa. 2007). A "broad and vague implied promise" will not support a promissory estoppel claim. See C & K Petroleum Prods., Inc. v. Equibank, 839 F.2d 188, 192 (3d Cir. 1988). A promise "must be certain and explicit enough so that the full intention of the parties may be ascertained to a reasonable certainty." See Ankerstjerne v. Schulmberger Ltd., No. 03-cv-3607, 2004 WL 106886, at *5 (E.D. Pa. May 12, 2004), aff'd, 155 F. App'x 48 (3d Cir. 2005). In support of their position, Defendants persuasively cite to Ankerstjerne, a case where a plaintiff in a sales position was paid performance-based bonuses in calendar year 2001, but was not awarded performance bonuses in the subsequent calendar year, despite performing his duties satisfactorily. In that case, an employee of defendant stated that "it was ridiculous" that the plaintiff had not been compensated and that it would be "taken care of as per the terms of [plaintiff's] compensation plan." See id. at *6. The court found that such representations, which failed to identify how any payment to the plaintiff would be calculated, were simply too indefinite to support a claim for promissory estoppel. See id.

As noted above, the alleged representations relied on by Plaintiff consist of the following: management "would look into applying the 2018 plan to the several large opportunities Plaintiff was working on"; members of the management team stated at various times that the SICP issue "had gone no further" and "had still not been resolved"; an individual associated with Defendants stated that he "will make sure you are fairly compensated for the hard work"; and "I looked after you for the DTE deal. Didn't I?" (Doc. No. 18 ¶ 17.) As noted by Defendants, none of these statements reflect a promise by Defendants' management team to calculate a commission on the

FirstEnergy deal in any particular way—specifically, to apply the 2018 SICP to a transaction that closed in December of 2019.[6] The alleged statements fail to indicate with "reasonable certainty" Defendants' intent, and so cannot constitute an enforceable promise. See Ankerstjerne, 2004 WL 1068806, at *5; see also Morris v. Ace Medical Co., No. 95-1271, 1996 WL 69400, at *9 (E.D. Pa. Feb. 16, 1996) (finding promise too indefinite to support promissory estoppel claim where there were "no terms agreed upon between the parties").

Even assuming arguendo that the representations alleged in the SAC were sufficiently definite to constitute an enforceable promise, the SAC still fails to plausibly allege an action that Plaintiff took or refrained from taking in detrimental reliance on any alleged promise.[7] In his brief in opposition to Defendants' motion to dismiss the SAC, Plaintiff characterizes the action taken by him as follows: "[r]elying on management's promises, [Plaintiff] consolidated what would have been three (3) separate orders, none of which would have been 'large orders' as defined by the 2019 SICP, into a single purchase order of more than sixteen million three hundred thousand dollars ($16,300,000.00)." (Doc. No. 21 at 10.) However, as noted by Defendants, Plaintiff's SAC does not allege that Plaintiff had the authority or the ability to break the FirstEnergy sale into three separate orders. In fact, the SAC alleges the opposite—that

---

[6] In his brief in opposition to Defendants' motion, Plaintiff concedes that "most of management's assurances were admittedly vague." (Doc. No. 21 at 8.) However, the one representation that Plaintiff points to as sufficiently specific to constitute an express promise is Cauldwell's statement to the effect that "I looked after you for the DTE deal. Didn't I?" (Id.) The Court cannot agree that such a statement constitutes a certain and explicit promise to pay Plaintiff any particular commission related to the FirstEnergy sale.

[7] As noted above, in its previous Memorandum addressing Defendants' motion to dismiss Plaintiff's amended complaint, the Court found that Plaintiff did not allege that he "refrained from closing a purchase in 2018 (under the terms of the 2018 SICP)," or that "he had some other, more profitable, employment opportunity or course of action that he would have pursued had he known that the terms of the 2018 SICP would not ultimately be applied to any part of the FirstEnergy transaction." (Doc. No. 16 at 23.)

Plaintiff consolidated the FirstEnergy sale from three purchase orders that would have been completed over three years into one sale—"[a]t the direction of his superiors." (Doc. No. 18 ¶¶ 10, 45.) Accordingly, Plaintiff's SAC still fails to allege some course of action that he could have or would have pursued if he had known that the terms of the 2018 SICP would not be applied to the FirstEnergy transaction.

Because the representations alleged in the SAC are not definite enough to constitute an enforceable promise, and also because the SAC fails to allege some course of action that Plaintiff could have or would have pursued if he had known that the terms of the 2018 SICP would not be applied to the FirstEnergy transaction, Plaintiff's SAC fails to allege facts supporting a plausible claim for promissory estoppel. The Court will grant Defendants' motion to dismiss the claim with prejudice. The Court turns to Defendants' arguments pertaining to Plaintiff's negligent misrepresentation and fraud claims.

### B. Fraud and Negligent Misrepresentation Claims

Pennsylvania law requires a plaintiff to allege the following with regard to a claim for fraud: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." See Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994) (citations omitted). Pennsylvania law requires the following allegations with regard to a claim of negligent misrepresentation: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known of its falsity, (3) with an intent to induce another to act on it; (4) which results in injury to the party acting in justifiable reliance on the misrepresentation." See Bilt-Rite Contractors, Inc. v. The Architectural Studio,

866 A.2d 270, 277 (Pa. 2005) (citation omitted). Pennsylvania's causes of action for fraud and negligent misrepresentation generally track the elements of such torts set forth in the Restatement (Second) Torts. See id.; Gibbs, 647 A.2d at 889

The Court concludes that, for the reasons discussed above in connection with his promissory estoppel claim, Plaintiff's SAC fails to plausibly allege that he acted or refrained from acting in justifiable reliance on any alleged actionable misrepresentation to his financial detriment, and therefore, the SAC fails to state a claim for fraud or negligent misrepresentation. While Plaintiff's brief characterizes the action taken by him as his consolidation of three separate orders into a single purchase, the SAC does not allege that Plaintiff had the authority or ability to divide the FirstEnergy purchase into three separate orders, instead alleging the opposite—that his action was directed by management—by asserting that Plaintiff consolidated the FirstEnergy sale "[a]t the direction of his superiors." (Doc. No. 18 ¶¶ 10, 45.) Accordingly, in the absence of a plausible allegation that Plaintiff acted or refrained from acting in detrimental reliance on any actionable misrepresentation, the Court will also dismiss Plaintiff's claims of fraud and negligent misrepresentation.

Having previously afforded Plaintiff the opportunity to file a second amended complaint in an effort to address the pleading deficiencies in his promissory estoppel, fraud, and negligent misrepresentation claims, the Court concludes that any further amendment of these claims would be futile.

**IV.     CONCLUSION**

For all of the foregoing reasons, the Court will grant Defendants' motion to dismiss. An appropriate Order follows.